I'd like to personally welcome Judge Schrader, who is here from Texas visiting with us. We all thank him for being here and hope he's enjoying his experience. The first case for argument this morning is Washington v. The Bureau of Prisons, No. 23-15-66. Mr. Bishop, when you're ready. Yes, Your Honor. Your Honor, Mayor of the Police Court, my name is John Bishop. I'm here on behalf of Petitioner Ms. Callie Washington. The appeal in this case revolves around three central arguments. First, that the arbitrator was relying on non-facts when he made his decision. Secondly, that the arbitrator's interpretation of policy was erroneous and to the point it rose to the level of arbitrary and capricious. And then finally, that the untimely investigation did result in a due process violation not actually found by the arbitrator. But for today's purposes, it may be better to kind of look at the charges themselves and apply those to the arguments that were made. The charges were threefold, outlined in the revised proposal letter, appendix 1239-1243. Charge one was a failure to conduct shoe rounds on August 24th, 2019. Specifically three issues, from 4.30 to 5 p.m., from 5 to 5.30 p.m., and from 6 to 6.30 p.m. Charge three was an introduction of contraband, an unauthorized electronic device. On the contraband, your client admitted that she violated policy, correct? Your Honor, if you hear what the investigator said, when we look at his testimony, and I can point that to you. I was asking what your client. No, my client admitted she brought in the Apple AirPod. I do acknowledge that 1208 of the appendix, I do acknowledge that I violated policy when I brought the earphones into the institution. I understand that, Your Honor. How can we possibly do something about that? Because the investigator himself acknowledged, discussed that when he walked him through the affidavit, there was an indication. Those affidavits were prepared by the investigator, an arbitrator, sorry, S.I.A. Newsom, acknowledged that he walked him through these affidavits. She has stated repeatedly throughout that she never thought she was bringing in policy. Now, at the time she gave the affidavit, she was aware that it was being told it was against policy. If you look at her contact, she repeatedly said, after that I never brought them in again, but I brought them in repeatedly. Part of that, we'll go back to the due process issue of not being able to investigate and talk to all of our witnesses. There were individuals who were at the front lobby that day. If she truly was bringing in contraband, and her policy was contraband, how did she get past the security screening without them flagging it? If she was wearing contraband throughout her shift, how did any of those other officers not report her for wearing an AirPod throughout the shift if that was a violation of policy? In terms of the missing witnesses, were you permitted to subpoena witnesses, and did you do so? The subpoena power has actually been argued by the BOP repeatedly, whether or not they believe an arbitrator has the authority, or any authority, to subpoena witnesses. So, I'd love if a different position is taken, but their position is there is no subpoena authority. We may request our witnesses, which we did, through the witness list in the appendix. We called the witnesses throughout the shift. I saw that you made a request for an adverse inference, given that certain witnesses didn't appear, and the arbitrator apparently didn't grant the adverse inference. I don't see that issue being appealed. Do you agree with that? I agree we're not requesting for the adverse inference, but we do believe that there was a due process violation based on the untimeliness. As came out, Captain Wyrick, whose testimony is extremely relevant to this case, had retired one month before the arbitration, and he was not produced. Did you attempt to call him? We have no contact information, and there's no obligation to provide that information to us, but we obeyed. But did you ask the arbitrator, or tell the arbitrator, you want this person as a witness at the arbitration? Yes, sir. We attempted to call these witnesses, and you can see in the appendix, from 753 to 755, we called them on the record of the arbitration, three pages worth of transcripts of us calling witnesses, and the agency repeatedly telling the arbitrator they are not available and will not be produced. And did you preserve that? I mean, you didn't argue any of this. What you argue as a due process violation, that doesn't sound like a due process problem. That sounds like an evidentiary problem, and if the arbitrator failed to require the agency to produce a material witness, then that might have been error, but I don't see that in the briefs. The issue becomes one of timeliness. Had these been current BOP employees, the BOP would have had no choice to produce these. The fact that they took 910 days from the day that the incident occurred until they issued the decision resulted in the fact that these witnesses who would not have been retired but follow that delay, and then for the arbitrator to make a factual finding, there was no harm or prejudice. Well, but, I mean, that's a different question, too, but it doesn't appear, like, I'm not sure myself whether arbitrators have subpoena power or not, but you didn't ask the arbitrator to issue a subpoena. No, sir. I cannot, at least in the record before you, and I would have to go through my notes whether that was ever requested, but I do not recall a subpoena ever being requested. One potential prejudice, which I think maybe you develop in your reply brief, so I'm concerned that that may be too late, is that initially there was, like, a 35-day suspension recommendation, and then there was the Jeffrey Epstein suicide, and then things apparently became more strict in terms of sanction when there was a suicide, and then your client ended up being removed. Do you argue that that's prejudice, that because it took so long, the BOP policy changed and became more severe? And if that is your argument, while there might be merit to that, I'm concerned you may have waived or forfeited that argument. And I don't believe we did. I believe that we have addressed the due process issue of untimeliness in the original brief. Once there got some discussion between Bode and Ross in the brief by the agency, it's probably developed a lot more in the reply brief, but no, you're absolutely correct. There was a BOP policy change between March 21 and August of 2021. It's acknowledged in the appendix on page 188. Prior to that, though, both the proposing official, the original proposing official, had proposed a 35-day suspension. The warden acknowledged on the record that he had made the decision he was only going to suspend her 35 days. But he didn't issue a decision. He never issued the decision because, between that March 21 and August 21, a policy change instituted, and the warden's decision was changed by some unknown deciding official who came back and said, no, you're going to terminate this employee. Well, who did the ultimate final decision, though? I mean, the warden signed off on the ultimate final decision. It wasn't some unknown final decision. It was the agency as a whole changed its policy on this and directed that the individuals involved here take another look under the new policy. Is the agency not permitted to do that? The agency is permitted to review and to go through the process. But ultimately, the proposal is in the hands of the proposing official, who should be the supervisor with direct knowledge, which, of course, in this case, once that changed, no longer was. And then the deciding official should be the one who ultimately makes the decision. When the warden institute said he had made a decision in reviewing it, a decision had been made at that point. Conversely, not as a matter of law until it's actually issued to your client. Right. But the issue was, had that delay not occurred, had we not had a 910-day gap, that decision should have been rendered well prior to any BOP policy change in March of 2021. Well, I mean, I don't understand why that delay is, per se, harmful error in a constitutional sense. Sure, your client might have gotten lucky if she'd gotten through the suspension process before the agency changed a policy, but she didn't. Well, I mean, there's nothing wrong with the agency changing policy and recognizing that perhaps they need to be more serious about Suicide Watch. I would agree with you. This wasn't something that was addressed in place, but you're asking about it, so I'm going to respond. If that's the case, if an agency is going to impose a stricter penalty on an employee, there's where a notice requirement comes in. You should be under notice not only of what is wrong, but what the penalties and what should happen to you if you're wrong. But she was under notice, right? Even under the old policy, the penalty for failure to do this watch on a first offense went all the way to removal. Well, so she was on notice that even one instance of violating her duty to do rounds could result in removal. Your Honor wants to give that much credence to it, but you also- That's in the table of penalties. Yeah, but that table of penalties for almost every single penalty says letter of reprimand to removal, MSPB, and I can't recall if this court has followed with that, has said such a broad range of penalties provides really no guidance. Almost every penalty is all the way from letter of reprimand to removal. But yes, Your Honor, under the technical wording, yes. There was an issue where removal could have been an issue for technically any violation. But where I was going- You're into your rebuttal. You can go anywhere. You can save your time for rebuttal. At this point, I'll save my time for rebuttal, Your Honor. Thank you. Let's hear from the governor. Good morning, Your Honors. May it please the court. Ms. Washington does not give this court any reason to disturb the arbitrator's decision. Ms. Washington admitted to all of the facts underlying each of the charges, and sworn affidavits and testimony. It is important to note the context in which all of her conduct occurred. She worked in the special housing unit, which was a jail within a jail, where inmates relied exclusively on correctional officers for all of their needs. She admitted to violating her supervisor's instructions on two separate occasions. She admitted to, on August 24th of 2019, to failing to conduct rounds during a relevant time when an inmate died by suicide. And she also admitted that on that same day, she brought in air pods into the institution. And at the beginning of her shift and throughout her shift, until the time when they discovered the inmate, she was listening to music in her ear. The arbitrator repeatedly says that she admitted she failed to complete her rounds in the shoe. Isn't that an overstatement from what she admitted? She admitted that she understood the various shoe officers were ultimately all responsible for all the rounds, but she contended that she and I think Officer Martinez, but one of the other ones, had split things up. And she insists she did her part within the split. But yet the arbitrator repeatedly says not only did she not do her rounds, but that she admitted she did not do her rounds. That's not correct, is it? It is, Your Honor, because all three officers in their sworn affidavits acknowledged that the rounds are not assigned to any specific individual. The rounds are the responsibility of each individual. So essentially, she is admitting that the rounds in the northwest quadrant were her responsibility as well. And she did admit to not completing those rounds. So I don't think that's an oversimplification, or excuse me, overstatement of what she admitted to. If, just for the sake of argument, if I, so one place the arbitrator says at A6, she admitted she did not conduct her rounds in the northwest quad. If I think the arbitrator misunderstood her admission, that she was saying I'm responsible for northwest, that is in the split, I agreed I would do northwest, and I admit I didn't do it. I could we still affirm, and if so, how? Yes, Your Honor, because the testimony was that even if officers split their rounds, they were required to still check in with each other to confirm that the rounds were conducted. And she testified that she never bothered to do that. She did not contact Officer Martinez. She did not contact, she did not review the round log. And she otherwise didn't even know that the round were not completed until after the inmate was found dead in his cell. So I think collectively, the evidence clearly shows that she knew it was her responsibility as well, and she failed to complete them. I want to address a couple of things that were mentioned during. Can you talk about the order to redo the proposal? Yes, Your Honor. I mean, at a certain point, upper-level agency officials can't interfere with the proposing official and the deciding official's decisions, right? Your Honor, here the testimony was clear, and Ms. Brown testified regarding this, that the warden ultimately had the decision-making authority, and he was free to overrule the proposed letter. To remove? Yes. What would the situation be if, hypothetically, instead of just having the proposal for 35 days, and the warden thinking he was going to sustain it, but actually sustaining it and issuing a decision, and then the agency sees that and comes back and says, no, that's not severe enough. You need to redo this. Would that be a problem? I think under those circumstances, I think it gets closer to being a problem based on some of the case law that we've discussed in our brief, but that's not what occurred here. Here, it was, as Your Honor just pointed out momentarily ago, there was an agency shift. So the shift did not happen simply. It did not apply only to Ms. Washington. It applied across the board. Do we know what happened to the other person that didn't complete the same rounds and was actually supposed to do the rounds where this inmate was located? Officer Martinez? Yes, Your Honor. We know that at the time of the arbitration hearing, he was no longer employed at the agency. The warden testified that initially a letter of proposed removal was issued against him. However, he did provide an oral response and several mitigating circumstances. So after that, I believe that he was demoted. But as far as the exact reasons for his departure from the agency, that's not on the record. And I did request that information, but unfortunately, I did not get it in time. So he, even though he was the one that... And I understand that they were both responsible for all the rounds, but he's the one that actually didn't do the watch. He ended up with a less severe punishment than Ms. Washington. That's correct. Isn't that a disparate penalty? It is not, Your Honor. And the warden specifically explained this situation. When he was discussing his rehabilitation analysis of Ms. Washington, he stated that he had serious doubts about any potential for rehabilitation because in the union's response, there was no acceptance of responsibility for her actions. He also testified that she never apologized or indicated that she would not do the misconduct again. And he also explained that the oral and written responses aid him in failing on the right or justifiable sanctions for discipline. And without the same, that hinders his analysis process. So we're not sure what the circumstances, what the mitigating circumstances for Officer Martinez were, but we know that he did provide an oral and written response and mitigating circumstances. And it's clear on the record that Ms. Washington failed to do that. May I ask a question following up on the questions Judge Hughes and Judge Stark asked about the allegation that petitioner makes that the length of the investigation was arbitrary and capricious and that potential testimony was lost. That would have been helpful to the petitioner. Do you know whether the arbitrator has the ability to issue a subpoena to compel attendance at a hearing? Your Honor, we do know that there is one statute, 5 U.S.C. 578-3, which states that an arbitrator has the authority to compel the attendance of witnesses. Of course, this issue was not litigated below because Ms. Washington did not attempt to compel any of the witnesses that she wanted to be present at the hearing. She also indicates that she had no way of requesting information about the individuals that had retired from the agency. But pursuant to 5 U.S.C. 71-14-B-4, the union does have the ability to request data regarding information for those individuals. And again, she did not do that either. And Ms. Washington does claim that the agency had the requirement to produce those witnesses. However, the agency has its burden to prove the charges. The agency gets to decide which witnesses are most relevant to meet its burden. There's nothing in the master agreement that requires the agency to produce or to compel witnesses that are not employed by the agency. And I'll address Your Honor's questions regarding the timing and the prejudice by the unavailability of those witnesses. Regarding the timing, the evidence showed that there was no investigative special agent at the FDC Miami between August 2019 and January 2020 when investigator Newsom began his position in January. He had over 65 active cases. Moreover, both he and the warden testified that Ms. Washington's own unavailability and her frequent missing of her regularly scheduled shifts contributed to some of the delay. Of course, there was also Ms. Brown that was unavailable for part of the time due to medical reasons. And between the initial proposed letter and the final decision letter, there were, of course, two union responses which collectively took a couple of months. And again, the warden testified that it took some time because of Ms. Washington's own unavailability. In terms of whether Ms. Washington was prejudiced by the delay for the time it took to complete the investigation, the only thing I saw the arbitrator saying about that was that A13, that she was on notice that the matters were being investigated. So she was not prejudiced by the delay. Is that an adequate consideration of the arguments she was making about how she was prejudiced? Well, your honor, as the panel noted earlier, Ms. Washington merely requested an adverse inference for the unavailability of witnesses. And it's correct that Ms. Washington was on notice. And she was on notice from early 2020. I think it's undisputed she's on notice. My question really is, is that all she was arguing? I'm prejudiced because I wasn't on notice? That is, doesn't the arbitrator have an obligation to consider the arguments she made for prejudice? And if so, did the arbitrator do that? I think the arbitrator certainly did that, your honor. Perhaps he could have been a little bit more detailed in his analysis, but I think it was clear that he didn't consider any prejudice to be present here. The prejudice that she claims is regarding the unavailability of witnesses. Here, she's complaining that the proposing officials were unavailable. In particular, she discusses that Captain Rarick would testify regarding the loss of confidence, which is Douglas Factor No. 5. However, he retired. He would no longer be supervising her anyway. And the warden testified that his own confidence in Ms. Washington was greatly diminished. Additionally, the warden was available and cross-examined. And regarding whether Captain Medina would have been able to testify, as she claims consistently with the warden, that the first charge was actually not sustained. That's inaccurate. The warden only conceded that one of the specifications was not sustained. On the adverse inference, it seems clear that the arbitrator didn't draw an adverse inference. But does the arbitrator ever deal with that expressly and say, I was asked and I'm rejecting that request? I'm not sure of the exact legal requirement on that point, your honor. But I think that as long as the decisional path is evident from the entirety of the opinion, I think that the court can certainly affirm on that basis. Lastly, I know I'm running out of time. So I wanted to address Ms. Washington's contention that she was prejudiced by the change in position in the agency shift between the suspension and the removal. As the panel noted recently, she did not elaborate on that in her opening brief and she has waived that issue. And additionally, the warden had the ultimate decision-making authority here. The decision was within the table of penalties. Each of the charges here carried individually a punishment of up to removal. And the reason why, as Ms. Washington claims, that the range was too broad here is because we are dealing with a correctional institution where one mistake could lead to disastrous consequences as it happened here. After the new proposal to remove it, the warden thought that 35 days was really still the appropriate penalty. Could he have mitigated the penalty back down to 35 days? I think so, Your Honor. Based on the fact that he testified that with regard to Officer Martinez, based on the mitigating circumstances that were presented, he chose a demotion rather than removal. So I think it would have depended on the mitigating circumstances. So there are three charges, I think. I guess I'm interested in what you believe should happen procedurally with one of those charges if we felt like one charge should be overturned. The argument the petitioner makes is that the arbitrator abused his discretion by failing to analyze the Douglas factors. Well, what procedurally would happen at that point? Would the case need to be remanded for an analysis of the Douglas factors? I think, Your Honor, generally speaking, unless there's evidence on the record that the agency would have reached a decision regardless if one of the charges was unmet, then perhaps a new analysis might be required. Here, the warden testified that he 100% believed that even without one of the specifications, the removal was reasonable. And I think in reviewing his testimony as a whole and his decision letter, he considered each of the charges to be very severe. So I believe that under those present facts that affirmance is still appropriate. All right. Thank you. Thank you, Your Honor. Mr. Bishop, you have a little under five minutes left. All right. Thank you, Your Honor. To address a few of the issues, first as far as the arbitrator designating those as her rounds. As Your Honor pointed out, he did so over seven times in just a very few pages. He actually provided any insight. And then he further annotated how bad his misunderstanding was. He goes on to say Gonzales himself, the inmate who committed suicide, was on the round or the area that the grievance was assigned. It's undisputed he was on the Northwest that if there was an assignment, that was Martinez's assignment. Well, he then goes on to state that... I'm sorry, Your Honor. Let us stop what I'm talking about. I apologize, Your Honor. You're talking about assignment, the split as if that was an official assignment, but that's not true, right? It's the assignment is for the whole area that the guards themselves can agree to informally split, but the actual duty shift is for the whole area, isn't it? So the policy says a staff member. If a staff member, doesn't have to be she, is doing that round, all policies are met. So by Martinez saying, I'm doing this round while you're doing hers, and there's no doubt she did hers. The photographs and the evidence show at the times in question, there was a picture of her on her range doing her round. It's not like she wasn't performing rounds and sitting in the office. The evidence indicated what she was doing. But she also was responsible for ensuring that the entire round was done. If so, you're imposing a strict liability on every one of those officers as to things they have no ability whatsoever to see. If you say that you have to see them, but they can call the other officer or require the other officer to call them and say, we've both done our checks, right? Remember that officer falsified the sheet indicating he had done the round. So I mean, there's no indication that he hasn't. Until after the inmate committed suicide. We know she didn't specifically ask, but if you recall the evidence, whenever they open the doors, those are called on the radio. It both Warden and Newsom admitted that they were callouts because remember, they can't even access that range until the shoe number one officer unlocks the door to let them in. So they had unlocked the door to let her on her range and then unlocked the door to allow Martinez on his range. That should have been called onto the radio. Now what Martinez did when he was on that range, how can she be strictly, how can she know what was done? We do know that she was performing rounds. And in this case, the arbitrator specifically says that was her assignment. It wasn't her assignment. It was assigned to a staff member, but not her specifically. And he even goes on and doubles down by saying, another officer signed his initials in the grievance place on the log. How was that the grievance place on the log? That was the place on the log as to whoever did the round. And in this case, Martinez indicated. It's clear the arbitrator did not understand the facts surrounding here and mistakenly believe that she was specifically told or indicated to do that round. I understand why you would not want a strict liability policy, but what legal prohibition is there on the agency deciding its policy is strict liability among all the shoe officers? I mean, honestly, that would probably be a complete briefing issue. As to the imposition there, but you cannot hold an employee responsible for something outside of their control. I mean, so what if she had called Officer Martinez and Officer Martinez said, I did the round. Is she now still liable because he lied to her? Where does that line drop in this case? He indicated he did the round. She had no reason not to believe it was done. I'm sorry, Ron. Secondly, if I have just a quick moment, I would like to address the same factual issue on the introduction of contraband. Both the warden and then the arbitrator made some very faulty technological conclusions. The warden stated that if she had AirPods, well, then she had to have had a cell phone, even though there was no allegation, investigation, or evidence that she had a cell phone. The arbitrator himself, did his AirPods themselves contraband? According to the HR manager, she wasn't sure. She said there was no memorandum on place. Some electronic, it says all electronic devices, but we're allowing some and not others. Smartwatches, she acknowledged she had a smartwatch. That was perfectly allowed, even though that's a Bluetooth capability, as long as it had no cellular. Yet the arbitrator made a, again, faulty technology that if she had AirPods and a smartwatch, well, then she can make a phone call. There's nothing to support that her smartwatch had any cellular capability. And the record is clear from the warden and the HR that the smartwatch was permitted. Okay. Counselor, you're out of time. Thank you. The case is submitted.